UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

TONI MITCHELL, Administratrix of the
Estate of D'Juantez Mitchell, et al.,                                              Plaintiffs,

v.                                                                      Civil Action No. 3:20-cv-530-DJH-RSE

STEVE CONRAD et al.,                                                           Defendants.

\* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Toni Mitchell and Courtney Jewell-Moore sued Defendants Louisville/Jefferson County Metro Government and current/former Louisville Metro Police Department (LMPD) officers Steve Conrad, Robert Schroeder, and Bryan Arnold, asserting a variety of federal and state claims arising from Arnold's fatal shooting of D'Juantez Anthony Mitchell on May 15, 2019. (Docket No. 1; *see also* D.N. 42)  Now, Arnold moves for summary judgment and argues that he is entitled to immunity under state and federal law.  (D.N. 90)  Plaintiffs oppose the motion.  (D.N. 93)  After careful consideration, the Court will grant in part and deny in part Arnold's motion for the reasons set out below.

**I.      BACKGROUND**

In Spring 2019, LMPD became aware of a string of armed convenience-store robberies. (D.N. 90-3; D.N. 90-4; D.N. 90-5; D.N. 90-6; D.N. 90-7; D.N. 90-8)  LMPD Detective Dan Mason reviewed video footage from one of the robberies and identified "a decent suspect vehicle": "a white Kia that had a missing front passenger hubcap," "a piece of trim missing," and a license plate on which "possibly one of the . . . characters was a four."  (D.N. 90-9, PageID.2335; *see also* D.N. 90-10, PageID.2480)  Mason then used a vehicle database to search for the suspect vehicle and identified a potential match.  (D.N. 90-9, PageID.2335–36)  The potential match vehicle was

1

reported as having been stolen, and Mitchell was listed as a suspect in that theft.  (*Id.*)  Following this discovery, Mitchell became a suspect in LMPD's robbery investigation.  (*Id.*, PageID.2337)

While searching for the suspect vehicle on May 15, 2019, LMPD officers James Clark and Matt Crouch located a vehicle that fit its description driving to an address associated with Mitchell.  (D.N. 90-10, PageID.2478–82)  Clark saw Mitchell exit and, approximately thirty minutes later, reenter the vehicle.  (*Id.*)  Clark and Crouch contacted LMPD sergeant Glen Parcus to discuss next steps, and they ultimately decided to follow Mitchell with the goal of discovering additional evidence.[1]  (*Id.*, PageID.2482)  Clark also contacted Arnold to see if he was available to assist, and Arnold agreed to do so.  (*Id.*, PageID.2482–83; *see also* D.N. 90-14, PageID.2606)  Arnold was not assigned to the LMPD's robbery unit at the time (D.N. 90-14, PageID.2549) but was generally aware of the ongoing robbery investigation (*id.*, PageID.2613–15) and had previously seen a surveillance photo from one of the robberies depicting "[a] suspect armed with a handgun."  (*Id.*, PageID.2614)  Arnold testified during his deposition, however, that he could not recall any distinguishing features from the photograph or whether he could see the suspect's facial features.  (*Id.*, PageID.2615)  Clark advised Arnold that they were surveilling a robbery suspect who was driving a white Kia (*id.*, PageID.2606–07), and Arnold and fellow LMPD officer Robert Skaggs left their office to assist.  (*Id.*, PageID.2608)

According to Clark, Mitchell was initially driving "very erratically," but the officers "had no reason to believe that [Mitchell] had spotted any" of the LMPD surveillance team.  (D.N. 90-10, PageID.2483)  As the surveillance continued, the officers "lost sight of" Mitchell and did not know "where he was located."  (*Id.*, PageID.2483–84)  Eventually, however, the officers again

---

[1] Mason was also involved in the surveillance of Mitchell's car on May 15, 2019.  (D.N. 90-9, PageID.2359–64; *see also* D.N. 90-10, PageID.2484)

located Mitchell, who was "still driving erratically." (*Id.*, PageID.2484) At this point, Clark became concerned that Mitchell "was doing counter surveillance measures." (*Id.*) So Clark, Mason, and Parcus decided that they "would go ahead and initiate a [traffic] stop once [they] had adequate . . . support to do so," and Clark and Mason asked LMPD officers in the area to assist with detaining Mitchell over police radio. (*Id.*, PageID.2484; D.N. 90-9, PageID.2376)

Mitchell subsequently drove into a residential neighborhood, followed by Arnold, and then by Mason.[2] (D.N. 90-9, PageID.2374) On police radio, Arnold stated that Mitchell was "doing counter-surveillance measures" in the neighborhood (D.N. 90-14, PageID.2636; *see also* D.N. 90-9, PageID.2375) and according to Mason, Mitchell was "going through stop signs." (D.N. 90-9, PageID.2375) Arnold and Mason learned that additional officers were coming to assist with the stop (*id.*, PageID.2376; D.N. 90-14, PageID.2637), and a police cruiser driven by officer Sarah King pulled out in front of Mitchell's vehicle as it approached the intersection of Watterson Trail and Ruckriegel Parkway. (*See* D.N. 90-14, PageID.2645–46; D.N. 90-9, PageID.2376–79) The light at the intersection turned red, and Mitchell came to a stop in a controlled manner. (D.N. 90-14, PageID.2646; *see also* D.N. 56) At this point, Mitchell's vehicle was situated between King's vehicle, which was closest to the intersection, and Arnold's vehicle, which was behind Mitchell. (*Id.*, PageID.2646)

The following events were captured by a surveillance camera, and the Court has reviewed the footage.[3] (*See* D.N. 56) Arnold drove his vehicle next to Mitchell's vehicle so that Mitchell's driver's-side door could not open. (D.N. 90-14, PageID.2646) At this time, King's vehicle was in front of Mitchell's vehicle, and Mason's vehicle was stopped close behind. (*Id.*) Arnold then

---

[2] At this point, Clark and Crouch "got lost and went in a different direction." (D.N. 90-9, PageID.2374; *see also* D.N. 90-10, PageID.2485–86)

[3] The footage does not include audio. (*See* D.N. 56)

activated his siren, got out of his vehicle, and ran to Mitchell's driver's-side window with his gun drawn. (*Id.*, PageID.2650, 2659–60) Arnold then positioned himself in front of Mitchell's bumper, leaned over the hood, and looked into Mitchell's windshield. (*Id.*, PageID.2659) When Arnold did so, "[i]t appeared as if [Mitchell] was on his phone through an earbud." (*Id.*, PageID.2665) Mitchell looked up at Arnold, and Arnold shouted that he was a police officer and that Mitchell needed to put his vehicle in park and put his hands up. (*Id.*, PageID.2659) The other officers at the scene, including Mason, Skaggs, and King, were also shouting commands to Mitchell at this time (*id.*, PageID.2661–65), and some of the commands contradicted Arnold's. (*See, e.g.*, D.N. 93, PageID.3536 (citing King's deposition, page 240)) According to Arnold, Mitchell "looked down and became despondent." (D.N. 90-14, PageID.2660) Arnold did not see a weapon in Mitchell's vehicle (*id.*, PageID.2670) and Mitchell did not curse, insult, or yell at the officers on the scene. (*Id.*, PageID.2688–89) Nevertheless, Arnold testified that he "believed [Mitchell] was armed" at the time of the shooting incident due to Mitchell's suspected involvement in the armed robberies. (*Id.*, PageID.1638–39)

King subsequently left her vehicle and came running up to Arnold. (*Id.*, PageID.2666) Arnold turned toward King and told her to "bring her vehicle up bumper to bumper" to prevent Mitchell from getting away, and then turned back to look at Mitchell. (*Id.*, PageID.2667–68) When he did so, Arnold saw Mitchell "quickly t[ake] his left hand to the steering wheel" and bring "his right hand . . . down to his right side."[4] (*Id.*, PageID.2668) Arnold testified that he then saw Mitchell's "right leg shift from the br[ake] to the accelerator" and "started to hear the engine rev." (*Id.*, PageID.2668–69) Later in his deposition, however, Arnold testified that he could not see Mitchell's entire body and could only "see . . . waist high," "from about the top of his thighs up."

---

[4] These actions are not visible in the recording of the incident. (*See* D.N. 56)

4

(*Id.*, PageID.2670–71) Mitchell's car moved forward and struck Arnold (*id.*, PageID.2669), and Arnold shot and killed Mitchell. (*Id.*, PageID.2672–74)

The parties dispute whether Mitchell's vehicle moved forward first, or whether Arnold shot first. (*See* D.N. 90-1, PageID.2233; D.N. 93, PageID.3531) Arnold testified that he only shot Mitchell after being struck by Mitchell's car. (D.N. 90-14, PageID.2673) Other witnesses, however, testified that the car moved forward only after Arnold fired his weapon. (D.N. 93-5, PageID.4616; D.N. 93-7, PageID.4928) The video of the incident is not clear on this point. (*See generally* D.N. 56) At his deposition, Arnold agreed that shooting Mitchell before Mitchell's vehicle started to move forward would have constituted excessive force. (D.N. 90-14, PageID.2702)

Mitchell's vehicle eventually came to a stop when it struck the front of King's vehicle. (*Id.*, PageID.2674; *see also* D.N. 56; D.N. 93-7, PageID.4928) The parties dispute whether the path of Mitchell's vehicle endangered King. (*See* D.N. 93, PageID.3538; D.N. 90-1, PageID.2246) Mason and Arnold both testified that King's position at the time of the shooting placed her in immediate danger of being struck by Mitchell's vehicle. (D.N. 90-9, PageID.2422; D.N. 90-14, PageID.2674) At least one eyewitness, however, stated that "there were no people in the path of" Mitchell's vehicle when it moved forward. (D.N. 93-7, PageID.4928) The video of the incident shows King running away from Mitchell's vehicle, with King being approximately one and one half cars width in front of the vehicle when it began to move forward. (D.N. 56) Based on the video, it is unclear whether King was in immediate danger of being struck by Mitchell's vehicle at the time of the shooting. (*See id.*)

Mitchell's autopsy showed that he had been shot six times. (D.N. 93-15, PageID.4976) Arnold testified that he shot Mitchell "because [he] had just been struck by the vehicle and [he]

5

was in fear that [Mitchell] was going to crush [him] against [his] vehicle." (D.N. 90-14, PageID.2673) In addition, Arnold stated that he was concerned "that [King] had not gotten out of the way between the front of [Mitchell's] car and hers." (*Id.*) Later in his deposition, Arnold also testified that he thought he was justified in shooting Mitchell "before [Mitchell] ever stepped on the gas" because Mitchell "started reaching for his gun." (*Id.*, PageID.2724) It is undisputed that no weapon was recovered from Mitchell's vehicle after the shooting, however. (*See* D.N. 90-1, PageID.2234; D.N. 93, PageID.3541) Ultimately, Arnold suffered a bruise from the incident (D.N. 90-14, PageID.2671), but no other officers were injured. (*See id.*, PageID.2684)

On July 28, 2020, Plaintiff Courtney Jewell-Moore, the mother of Mitchell's children, sued Louisville Metro, Conrad, Schroeder, and Arnold. (D.N. 1) As to Arnold, Jewell-Moore asserted a 42 U.S.C. § 1983 claim alleging that Arnold's shooting of Mitchell violated the Fourth Amendment. (*Id.*, PageID.8–9 ¶¶ 37–39) Jewell-Moore also asserted three state-law claims against Arnold: battery (*id.*, PageID.10–11 ¶¶ 45–49), "wrongful death and loss of love and affection" (*id.*, PageID.11–12 ¶¶ 50–56), and "gross negligence/reckless conduct." (*Id.*, PageID.12 ¶¶ 57–59) Toni Mitchell joined the case as the personal representative and administratrix of Mitchell's estate on July 14, 2021. (D.N. 42) Then, Louisville Metro, Conrad, and Schroeder moved for summary judgment (*see* D.N. 88), as did Arnold. (D.N. 90) The parties "agreed that if Defendant Arnold were to prevail on his motion for summary judgment, any dispositive motions on [Plaintiffs' municipal liability claims against the other defendants] would be moot," and requested that the Court resolve Arnold's motion first. (D.N. 86, PageID.2215–16) Based on the parties' agreement, the Court administratively remanded Louisville Metro, Conrad, and Schroeder's motions pending the resolution of Arnold's motion. (D.N. 88) The Court

considers Arnold's motion for summary judgment (D.N. 90) and Plaintiffs' opposition (D.N. 93) below.

## II.  ANALYSIS

Summary judgment is appropriate when a movant shows, using evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual dispute is "genuine" if a reasonable factfinder could resolve the dispute in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, to survive summary judgment, "the mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient"; there must be "evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252.  When considering whether to grant summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014) (citing *Anderson*, 477 U.S. at 255).

### A.  Federal Claims

Arnold argues that he is entitled to qualified immunity on Plaintiffs' § 1983 claims. (D.N. 90-1, PageID.2244)  "Section 1983 claims are subject to the affirmative defense of qualified immunity which, if applicable, shields individuals not just against liability but against the suit itself." *Regets v. City of Plymouth*, 568 F. App'x 380, 386 (6th Cir. 2014).  "The doctrine of [qualified] immunity shields government officials performing discretionary functions from civil liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Baynes v. Cleland*, 799 F.3d 600, 609 (6th Cir. 2015) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Phillips v. Roane Cty.*, 534 F.3d 531, 538–39 (6th Cir. 2008)).  The Court asks two questions when

determining whether an official is entitled to qualified immunity: "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?" *Id.* at 609–10 (internal quotation omitted). "The plaintiff bears the burden to show that the defendant is not entitled to qualified immunity." *Id.* at 610 (citing *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005)).

When determining whether an officer violated clearly established law, the Court must inquire "in the light of the specific context of the case, not as a broad general proposition." *Whiting v. Trew*, No. 22-5448, 2023 WL 5352133, at *4 (6th Cir. Aug. 21, 2023) (quoting *Clemente v. Vaslo*, 679 F.3d 482, 490 (6th Cir. 2012)). To meet their burden, Plaintiffs "must identify a case with a similar fact pattern that would have given 'fair and clear warning to officers' about what the law requires.'" *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 993 (6th Cir. 2017) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)); *see also Sultaana v. Corrigan*, No. 20-3896, 2021 WL 7160160, at *3 (6th Cir. Sept. 9, 2021). Although "[t]hat case need not be on all fours with the instant fact pattern to form the basis of a clearly established right," the relevant legal question "must be so settled that every reasonable official would have understood that what he is doing violates [the] right at issue." *Vanderhoef v. Dixon*, 938 F.3d 271, 278 (6th Cir. 2019) (internal quotations omitted).

Here, Plaintiffs merely note that in general, "the right to be free from excessive force is clearly established." (D.N. 93, PageID.3553) But this general proposition does nothing to demonstrate that "in light of the specific context of the case," Arnold violated clearly established law. *See Whiting*, 2023 WL 5352133, at *4; *see also Scott v. Becher*, 736 F. App'x 130, 132 (6th Cir. 2018) (explaining that "[t]he right cannot be defined at a high level of generality"). Indeed,

8

because "[u]se of excessive force is an area of the law in which the result depends very much on the facts of each case," "articulating the rule against excessive force at [a] general level will typically not clearly establish that force was excessive on a particular occasion." *Beck v. Hamblen Cnty., Tennessee*, 969 F.3d 592, 600 (6th Cir. 2020). Moreover, each of the cases cited by Plaintiffs on this point (*see* D.N. 93, PageID.3553) involved significantly different factual circumstances from those present here. *See, e.g.*, *Graham v. Connor*, 490 U.S. 386, 389–90 (1989) (individual was not behind the wheel of a vehicle at the time force was used and there was no concern that the individual would hurt someone with his vehicle); *Baker v. City of Hamilton*, 471 F.3d 601, 603–04 (6th Cir. 2006) (same); *Shreve v. Jessamine Cty. Fiscal Ct.*, 453 F.3d 681, 683–86 (6th Cir. 2006) (same); *Ward v. Cnty. of Cuyahoga*, 721 F. Supp. 2d 677, 681–86 (N.D. Ohio 2010) (same). Thus, Plaintiffs have not identified "a case with a similar fact pattern that would have given fair and clear warning" to Arnold that his conduct violated clearly established law.[5] *See Arrington-Bey*, 858 F.3d at 993. Arnold is therefore entitled to qualified immunity as to Plaintiffs' federal claims, and the Court will grant Arnold's motion for summary judgment on those claims.

### B.   State-Law Claims

Arnold also claims qualified immunity under Kentucky law as to Plaintiffs' state-law claims. (D.N. 90-1, PageID.2250) Under Kentucky law, qualified immunity protects a police officer so long as he performed "(1) discretionary acts or functions . . . ; (2) in good faith; and (3)

---

[5] Because Plaintiffs have failed to demonstrate that Arnold violated clearly established law, the Court need not determine whether Arnold's conduct was constitutionally permissible. *See Sultaana*, 2021 WL 7160160, at *3 ("We need not address whether the defendants' alleged seizure of Sultaana's cash violated his constitutional rights because Sultaana failed to point to a controlling case with a similar fact pattern that would have given fair and clear warning to officers about what the law requires." (internal quotations omitted)).

9

within the scope of [his] authority." *Reich v. City of Elizabethtown*, 945 F.3d 968, 982 (6th Cir. 2019) (quoting *Yanero v. Davis*, 65 S.W.3d 510, 521–22 (Ky. 2001)). Thus, contrary to Arnold's contention that the Kentucky qualified immunity analysis is "essentially identical" to that under federal law, (*see* D.N. 90-1, PageID.2250 (quoting *Jefferson Cnty. Fiscal Ct. v. Peerce*, 132 S.W.3d 824, 837 (Ky. 2004)), Arnold's subjective intent is relevant here. *See Reich*, 945 F.3d at 982 (noting that good faith is an element of the Kentucky inquiry); *B.L. v. Schuhmann*, 380 F. Supp. 3d 614, 656 (W.D. Ky. 2019) (explaining that for the purposes of the Kentucky qualified-immunity analysis, bad faith can be predicated on an officer's willful or malicious intent); *cf. Baynes*, 799 F.3d at 610–11 (noting that under federal law, "qualified immunity is an objective rather than a subjective inquiry"); *Wesley v. Campbell*, 864 F.3d 433, 442 (6th Cir. 2017).

Arnold bears the initial burden of "show[ing] *prima facie* that the act was performed within the scope of his . . . discretionary authority." *Yanero*, 65 S.W.3d at 523. "An officer's use-of-force determination is a discretionary act . . . . [that] falls within the scope of his authority." *Franke v. Janes*, No. 3:23-CV-119-RGJ-RSE, 2025 WL 269179, at *7 (W.D. Ky. Jan. 22, 2025) (citations omitted). The burden therefore "shifts to [Plaintiffs] 'to establish by direct or circumstantial evidence that the discretionary act[s] w[ere] not performed in good faith.'" *Reich*, 945 F.3d at 983 (quoting *Yanero*, 65 S.W.3d at 523). To demonstrate that Arnold lacked good faith, Plaintiffs can point to "(1) a violation of a constitutional, statutory, or other clearly established right which a person in [Arnold's] position presumptively would have known was afforded a person in [Mitchell's] position; or (2) evidence that [Arnold] willfully or maliciously intended to harm [Mitchell] or acted with a corrupt motive." *Id.* (internal quotations omitted).

10

Plaintiffs contend that the evidence in the record "is sufficient to create a jury question on the issue of good faith." (D.N. 93, PageID.3558) The Court agrees. First, Arnold's seemingly inconsistent testimony about the shooting provides circumstantial evidence of bad faith that must be considered by a jury. *See Strickland v. City of Detroit*, 995 F.3d 495, 513 (6th Cir. 2021) (explaining that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge on summary judgment") (internal quotations omitted). For example, Arnold's testimony that he was able to see Mitchell move his foot to the gas pedal is contradicted by his testimony that he could only "see . . . waist high," "from about the top of [Mitchell's] thighs up," and otherwise could not see Mitchell's body in the vehicle. (D.N. 90-14, PageID.2670–71; *cf. id.*, PageID.2668–69) Similarly, Arnold first testified that he shot Mitchell because of the threat posed by Mitchell's vehicle. (*Id.*, PageID.2673) Later in his deposition, however, Arnold stated that he "was justified before [Mitchell] ever stepped on the gas when [Mitchell] started reaching for his gun," (*id.*, PageID.2724), despite the fact that Arnold never saw a gun (*id.*, PageID.2639) and that a gun was not recovered from Mitchell's vehicle. (*See* D.N. 90-1, PageID.2234; D.N. 93, PageID.3541) Arnold's stated justification for the shooting is likewise called into question by eyewitness' testimony that the car did not begin moving until after shots were fired. (*See* D.N. 90-14, PageID.2668–69, 2673; *cf.* D.N. 93-5, PageID.4616; D.N. 93-7, PageID.4928) When viewed in the light most favorable to Plaintiffs, this evidence creates a jury question as to Arnold's good faith. *See Strickland*, 995 F.3d at 513; *see also Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010) (explaining that "[i]n reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited") (quotation omitted).

The sworn affidavits from several close members of Arnold's family stating that Arnold harbors significant racial animus against Black persons further supports this conclusion. For example, according to Arnold's ex-wife Shannon Arnold, Arnold frequently uses racial slurs and has "refuse[d] to go through a drive thru restaurant if there was an African American at the window handing out food." (D.N. 93-9, PageID.4933–34) Similarly, according to Arnold's other ex-wife, Melanie Arnold, Arnold uses racial slurs, has referred to Black people as "monkeys" and "gorillas," has stated that "you just can't trust [B]lack people," and has warned his daughter "to be careful" around Black individuals because "they might hurt her." (D.N. 93-10, PageID.4935–36) Arnold's daughter, Madaline Arnold, provides further examples of Arnold's bias against Black individuals. (D.N. 93-8, PageID.4930–31) Viewed in the light most favorable to Plaintiffs, *see Loyd*, 766 F.3d at 588, this is additional circumstantial evidence suggesting that Arnold "willfully or maliciously intended to harm" Mitchell—who was Black (D.N. 93-15, PageID.4977)—based on racial animus. *See Reich*, 945 F.3d at 983. In sum, whether Arnold is entitled to qualified immunity on Plaintiffs' state-law claims is a question of fact for the jury. *Cf. Franke*, 2025 WL 269179, at *8 (finding no genuine issue of fact as to good faith where plaintiff "d[id] not cite or otherwise identify any evidence" supporting assertion that defendant officer "maliciously used force against [plaintiff] as a means to inflict punishment for [plaintiff's] assumed domestic violence"); *Napper v. Hankison*, 617 F. Supp. 3d 703, 757 (W.D. Ky. 2022) (finding "failure to plead bad faith" where "[o]ther than a few conclusory allegations about the officers being motivated by religious animus and racism," the plaintiffs' complaint "contain[ed] no allegation by which the Court could infer malicious motivation to use unreasonable force").

Arnold also argues that he is entitled to statutory immunity pursuant to Ky. Rev. Stat. § 503.085. (D.N. 90-1, PageID.2251–53) Section 503.085 works "in tandem" with Kentucky's "justification" statutes in civil suits:

> [f]irst, the justification statute provides that the use of deadly force is justifiable when the individual "believes that such force is necessary to protect himself against death, serious physical injury, . . . [or a] felony involving the use of force[.]" [Ky. Rev. Stat.] § 503.050(2). It also permits the use of deadly force where an individual "believes that such force is necessary to protect a third person against the use or imminent use of unlawful physical force by [another]" and the individual believes "that the person whom he seeks to protect would himself have been justified" in using deadly force. *Id.* § 503.070(2) (emphasis added). Second, if an individual's use of deadly force is justified under either provision—self-defense or defense of a third person—he is "immune . . . from civil action for the use of such force[.]" *Id.* § 503.085(1).

*King v. Taylor*, 694 F.3d 650, 664 (6th Cir. 2012). When the question of whether a defendant subjectively believed that deadly force was necessary is "genuinely disputed," the Court should not grant summary judgment pursuant to § 503.085. *See id.* (explaining that summary judgment was not appropriate because it was "genuinely disputed whether [the defendant] believed such force was necessary to protect himself or another from death or serious physical injury").

There are a variety of factual disputes which call into question Arnold's subjective belief that deadly force was necessary and, as a result, make the entry of summary judgment pursuant to § 503.085 improper. As discussed above, Arnold's stated justification for the shooting contradicts the testimony of several eyewitnesses. (*See* D.N. 90-14, PageID.2668–69, 2673; *cf.* D.N. 93-5, PageID.4616; D.N. 93-7, PageID.4928) Similarly, Arnold's statements about what he could see in Mitchell's vehicle and why he shot Mitchell are seemingly inconsistent. (*See, e.g.,* D.N. 90-14, PageID.2670–71; *cf. id.*, PageID.2724) Moreover, Plaintiffs have produced substantial evidence of Arnold's racial bias against Black individuals. (*See* D.N. 93-10; D.N. 93-9; D.N. 93-8). Viewed in the light most favorable to Plaintiffs, these circumstances create a "genuine[] dispute" as to

whether Arnold actually "believed [deadly] force was necessary to protect himself or another from death or serious physical injury." *See King*, 694 F.3d at 664.

In sum, the evidence in the record, when viewed in the light most favorable to Plaintiffs, shows a genuine issue of material fact as to Arnold's good faith and subjective belief that deadly force was necessary. Arnold thus is not entitled to immunity under Kentucky law at this stage, and the Court will deny Arnold's motion for summary judgment as to Plaintiffs' state-law claims.[6]

### III. CONCLUSION

For the reasons set out above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)     Arnold's motion for summary judgment (D.N. 90) is **GRANTED** in part and **DENIED** in part. The motion is **GRANTED** with respect to Plaintiffs' federal claims. The motion is **DENIED** with respect to Plaintiffs' state claims. Plaintiffs' state claims will proceed against Arnold.

(2)     The Court requests that U.S. Magistrate Judge Regina S. Edwards (D.N. 12) hold a status conference to set a final litigation schedule, to include a settlement conference.

March 28, 2025

David J. Hale, Judge
United States District Court

---

[6] As a result, the Court will also deny summary judgment as to Plaintiffs' claim for wrongful death and loss of consortium. (*See* D.N. 90-1, PageID.2253 (arguing to dismiss these claims based only on Arnold's immunity under state law))